APPEAL OF JENNIE I. IRWIN, AS EXECUTRIX, AND EUGENE P. McCAHILL, ADMINISTRATOR WITH THE WILL ANNEXED, OF THE ESTATE OF MARY E. McCAHILL.

Docket No. 2547.   Submitted July 17, 1925.   Decided October 16, 1925.

Royalties received during the taxable years involved from iron ore which had been mined, removed from the leased premises and stockpiled prior to March 1, 1913, were not taxable income, but were choses in action and due decedent prior to that date.

*Guy Chase, Esq.*, for the taxpayer.
*A. Calder Mackay* and *Ward Loveless, Esqs.*, for the Commissioner.
Before GRAUPNER, TRAMMELL, and PHILLIPS.

This appeal involves income and profits taxes for the years 1916 to 1919, inclusive, amounting to $39,944.29. The deficiency results from the refusal of the Commissioner: (1) to allow depreciation on farm buildings for the year 1916; (2) to exclude from taxable income certain amounts received as royalties for ore mined, removed, and stockpiled prior to March 1, 1913; and (3) to allow as and for depletion of ore mined on decedent's property on the Masaba Range in St. Louis County, Minn., the rate claimed by the executors.

### FINDINGS OF FACT.

1. Jennie I. Irwin, is one of the executors named in the last will of Mary E. McCahill, deceased; and Eugene P. McCahill is administrator with the will annexed of said estate of Mary E. McCahill, duly appointed by the probate court for Wabasha County, Minn., to take the place of John Grimes, deceased, who was the other executor named in the said will. Mary E. McCahill died August 14, 1922.

2. Decedent, during the year 1916 and for some time prior thereto, was the owner of a 1,360-acre farm in Wabasha County, Minn., which she operated in producing grains and livestock on a large scale. Upon said farm property and used in carrying on said farming and stock-raising business there were 15 buildings, hereinafter referred to, not including her dwelling house, which were computed to have cost the amount set opposite each of said

building or buildings. In her income-tax return in 1916, decedent claimed depreciation on said buildings at the rate and in the amounts shown in the table below. No depreciation on said buildings, or any of them, had been allowed in the Commissioner's determination of net income for 1916. During the trial the Commissioner admitted that a mistake had been made as to the valuation of the farm buildings during the year 1916. The buildings referred to, together with the computed costs and rates and amounts of depreciation claimed, were as follows:

|  | Computed cost. | Rate claimed. | Amount of depreciation. |
|---|---|---|---|
|  |  | Per cent. |  |
| 1 brick farm building | $9,375.00 | 2 | $187.50 |
| 1 concrete farm building | 250.00 | 3 | 7.50 |
| 9 frame farm buildings | 14,750.00 | 3 | 442.50 |
| 4 frame farm buildings | 18,125.00 | 4 | 725.00 |
| Total | 42,500.00 | | 1,362.50 |

The depreciation claimed was reasonable.

3. The decedent kept two sets of records; one set of books covered the operation and management of the 1,360-acre farm owned by her and the other set of books covered the income received and disbursements made in connection with the interests owned outside of her farm, consisting of investments in stocks, bonds, loans, and iron ore mining property. The farm records were kept on the basis of cash receipts and disbursements.

4. The decedent was the sole fee owner of a mine known as the Shenango Iron Ore Mine, located on the Masaba Range in St. Louis County, Minn., which she inherited from her husband and which is described as follows:

The East Half of the Southeast Quarter of Section 22, the Northwest Quarter of Section 23, and the Northeast Quarter of the Northeast Quarter of Section 27, all in Township 58 North, of Range 20 West, in St. Louis County, Minnesota.

This was commonly known, and is at times hereinafter referred to, as the Shenango Mine.

5. The Shenango Furnace Co., a corporation, became the lessee of the above-described premises in the year 1906, and has continued in possession and has operated a mine on the land above-described continuously to the present time under the following lease:

LEASE.

This Indenture, Made this twenty-sixth day of May One thousand nine hundred, by and between Patrick H. Rahilly and Catherine Rahilly his wife, of Lake City, Wabasha County, Minnesota, parties of the first part, and O. D.

Kinney and George C. Howe of the City of Duluth, St. Louis County, Minnesota, parties of the second part,

*Witnesseth:* That the parties of the first part in consideration of the sum of One Dollar, to them in hand paid by the parties of the second part the receipt whereof is hereby acknowledged, and in further consideration of the covenants and conditions herein contained, to be kept and performed by the parties of the second part, do hereby let, lease and demise, to the parties of the second part for the term of thirty-five years from and after the First day of June, one thousand nine hundred, the following described land and premises situated in the County of St. Louis in the State of Minnesota, viz., the East half of the Southeast quarter of Section twenty-two (22); the Northwest quarter of the Southwest quarter of Section twenty-three (23) and the Northeast quarter of the Northeast quarter of Section twenty-seven (27), all in Township 58 North of Range 20 West of the Fourth Principal Meridian; which premises are leased to the parties of the second part for the purpose of exploring for, mining, taking out and shipping therefrom the merchantable iron ore, which is or which hereafter may be found on, in or under said land, together with the right to construct all buildings make all excavations, openings, ditches, drains, railroads, wagon roads and other improvements upon said premises, which are or may become suitable or necessary for the mining or removing of iron ore from said premises, with the right, during the existence of this lease, to cut and use the timber other than pine and tamarack, which is hereby expressly reserved, found upon said premises, subject to a certain timber deed dated April 23rd, 1898, and recorded in the office of the Register of Deeds in St. Louis County, Minnesota, on the 3rd day of May, 1898, in Book 153 of Deeds at page 269, also to a deed for a railroad right of way to the Swan River Logging Company Limited, with a contract back to move the track if necessary, in order to mine the ore thereunder, so far as may be necessary for fuel, other than for smelting purposes, and so far also as may be necessary for the construction of buildings required in the operation of any mine or mines found on the premises hereby demised, and also the timber, subject to said timber deed, and the tamarack which is hereby expressly reserved, required for drains, tramways, supports, railroads within such mine or mines, or connecting the mine or mines with the main line or lines of railroad, over or upon which the said ore may be transported, provided, however, that the parties of the second part shall have the right at any time to terminate this agreement in so far as it requires the parties of the second part to mine ore on said land or to pay a royalty therefor, or to pay taxes thereon, by giving sixty days written notice to the parties of the first part either in person or by mail registered and in case notice is given by mail registered, it may be addressed to Patrick H. Rahilly and Catherine Rahilly, Lake City, Minnesota, the parties of the first part, the parties of the second part paying rent or royalty for any part of a year this lease shall remain in force, at the rate hereinafter agreed and set forth; and thereupon the foregoing lease and demise shall terminate, and all arrearages and sums which may be due under the same, up to and including the date of its termination, as set forth in such notice, shall be paid upon settlement and adjustment thereof.

The parties of the first part further agree that the parties of the second part shall have the right under this agreement to assign this lease, and to contract with others to work such mine or mines, or any part thereof, for the purpose of mining for iron ores, with the same rights and privileges as are herein granted to the said parties of the second part, and that the uninterrupted rights of the parties of the second part to take, use and carry away

iron ore herein provided for, shall continue unsuspended, notwithstanding any disagreement between the parties hereto respecting the same or this contract, providing they shall duly pay for all ore shipped or agreed to be shipped at the time or times and in the manner stipulated for in and by this contract.

The parties of the second part in consideration of the premises hereby covenant and agree to and with the parties of the first part, that the parties of the second part will, on the tenth (10th) days of April, July, October, and January in each year (or on the day ensuing, if that day falls on Sunday) during the period hereinbefore stipulated, or during the period this contract continues in force, pay to or for the use of the parties of the first part, at such bank in the City of Duluth as the parties of the first part may from time to time, in writing, designate, for all the iron ore mined and shipped from said land during the three months preceding the first day of the month in which payment is to be made as aforesaid, royalty at the rate of twenty (20) cents per ton for each ton mined and shipped from the East half of the Southeast quarter of Section twenty-two (22) ; the Northwest quarter of the Southwest quarter of Section twenty-three (23) and the Northeast quarter of the Northeast quarter of Section twenty-seven (27), all in Township 58 North of Range Twenty (20) West of the Fourth Principal Meridian, in St. Louis County, Minnesota, each ton to be reckoned as twenty-two hundred and forty pounds (2240 lbs.).

The parties of the second part, at the time of such payment, shall transmit to the parties of the first part an exact and truthful statement of the amount of iron ore shipped during the three months for which such statement shall be made. The iron ore so shipped by the parties of the second part, from said land, shall be weighed by the railroad company transporting the same from said land, which weights shall determine the quantity as between the parties hereto. Said parties of the second part shall furnish to the parties of the first part, monthly statements showing the total amount of the aforesaid weights ; the right, however, being conceded to the parties of the first part to inspect, review and test the correctness of the railroad company's scales and weights, at any time, and in such manner as they may see fit to adopt, it being understood that any errors in these respects, when ascertained, shall be recognized and corrected in their accounts. The parties of the second part agree to pay all taxes, general or specific, upon the land so demised, which may be assessed, either against said lands and the improvements thereon, or the iron ore product thereof; or any personal property of said mines, from and after the date of this lease, during the continuance of this lease, and at the termination of this lease to quietly and peaceably surrender the possession of said land to the parties of the first part.

The parties hereto having prior to the execution of this lease, entered into an agreement dated December 1st, 1899, by which the parties of the first part gave to the parties of the second part an option for this lease, by the terms of which option the parties of the second part paid to the parties of the first part on the execution of said agreement for option, the sum of $1000 and agreed to pay as provided therein, the further sum of $1000 on the first day of February, 1900, and the further sum of $3000 on the 1st day of June, 1900, as advance royalties, it is hereby agreed that such payments being made shall stand and be treated as payments to the extent of $5000 for the first royalties falling due under the terms of this lease, but shall be forfeited to first parties as liquidated damages in case second parties abandon this lease prior to January 1st, 1901, or before sufficient ore to amount to $5000.00 has been taken out.

The parties of the second part further covenant that during the period for which this agreement continues in force there shall be mined and shipped from said land at least 25,000 tons of iron ore during the year 1900 and prior to January 1st, 1901, 50,000 tons during each of the years 1901 and 1902, 75,000 tons during the year 1903 and 100,000 tons during the years 1904 and each and every year thereafter during the continuance of this lease and in case the parties of the second part shall not ship from said land the quantity of iron ore per annum as herein specified, commencing with the time specified, the parties of the second part shall nevertheless pay to the parties of the first part a royalty of twenty (20) cents per ton upon 25,000 tons for the year 1900, upon 50,000 tons for each of the years 1901 and 1902, upon 75,000 tons for the year 1903 and upon 100,000 tons for the year 1904 and upon 100,000 tons for each and every year thereafter up to and until this lease shall expire or be terminated in the manner hereinbefore expressed, provided, however, that if in any one or more years more iron ore is thus paid for than is actually mined or shipped in such year or years, then in such case the iron ore so paid for and not shipped may be mined and shipped in any subsequent year during the continuance of this lease without other payment therefor but such ore so permitted to be mined and shipped in any subsequent year in consideration of such prepayment, must be in excess of the amounts above stipulated to be mined and shipped for the respective years as above specified.

It is mutually understood and agreed that upon the termination of this agreement, whether by the acts of the parties or either of them, or by limitation or otherwise, the parties of the second part shall have ninety days in which to remove all engines, tools, machinery, railroad tracks and structures erected or placed by said parties on said land, but shall not remove or impair any supports placed in the mines nor any timbers or frameworks necessary to the use and maintenance of shafts or other approaches to the mines.

The parties of the second part shall open, use and work the said mines in such manner only as is usual and customary in the skillful and proper mining operations of similar character, when conducted by the proprietors themselves, and so as not to do, cause or permit any unnecessary or unusual permanent injury to the same, or inconvenience or hindrance in the subsequent operating of the said mines, and in working of said mines the parties of the second part shall deposit all earth, rocks and other useless material or rubbish at such places and in such manner, as will not conflict with or embarrass the future operating of said mines.

The parties of the first part expressly reserve to themselves (and the parties hereto agree that the parties of the first part shall have) the right, in person, or by their agents or servants to enter into and upon the above demised premises, and any part or parts thereof, at any time or times, to inspect and survey the same, and measure the quantity of ores that shall have been mined or shipped therefrom, not unnecessarily or unreasonably hindering or interrupting the works or operations of lessees. The parties of the first part do hereby, for themselves, their executors, administrators and assigns, covenant with the said parties of the second part, their executors, administrators and assigns, that they, paying the royalty or rent hereby reserved and performing and observing the several covenants by the lessees hereinbefore contained, may peaceably hold and enjoy the said premises and the rights herein granted, during the said term without any interference or interruption by the parties of the first part, their executors, administrators or assigns, or any person lawfully claiming through or under them or any of them.

The covenants, terms and conditions of this lease shall run with the land and be in all respects binding and operative upon all assignees, sublessees and grantees under the parties of the second part.

The parties of the second part agree that when this lease shall for any cause terminate, said parties will enter or cause to be entered a certificate of that fact upon the proper book of record in said St. Louis County, provided this lease shall have been recorded there.

It is further provided and the present lease is granted upon express condition, that, if the rent hereby reserved (the said royalty being treated as rent) or any part thereof, or the said taxes shall be and remain unpaid after the days and times when by the preceding covenants the same should be paid (and if the same shall remain in default for more than sixty days after notice in writing to the parties of the second part, specifying the default), or in the event of the termination of the foregoing lease and demise, as hereinbefore provided, or in case the said parties of the second part shall fail to keep and perform any of the covenants or conditions herein expressed to be kept and performed on their part, then and from thenceforth and in either of these events it shall be lawful for the parties of the first part, after sixty days notice in writing, as aforesaid, at their option into and upon the said premises so demised, with or without any process whatever to re-enter, and the same to have and possess again, as of their first and former estate, and the parties of the second part, and all persons claiming under said parties wholly to exclude therefrom.

It is understood that the parties of the first part reserve and shall at all times have, possess and hold, a lien upon all the ore mined, and on all improvements made on said premises by the parties of the second part, as a security for any unpaid balances of money due under this contract, such balance being deemed and to be treated as balances of purchase money, and which lien may be enforced against such property in like manner as liens conferred by chattel mortgages are or may be entitled to be enforced under the laws of the State of Minnesota.

It is further mutually agreed that all grants, stipulations and conditions herein expressed shall apply to and bind the successors, heirs, executors, administrators and assigns (as the case may be) of the said respective parties.

The said lease was signed, witnessed, acknowledged, and filed for record in St. Louis County on June 2, 1900, at 10 a m., in Book X of Agreements, on page 43.

6. The Shenango Furnace Co., a corporation, came into possession of the premises above referred to under an assignment of the above-described lease during the year 1906, and in 1911 Mary E. McCahill became the owner in fee of said premises through the death of her husband, who had purchased said premises some time prior to the year 1906 from Patrick Rahilly and wife. Said lessee commenced shipping lean and rich ore from the Shenango mine in 1906, and in each of the years 1906, 1907, and 1908 said lessee mined, shipped, and paid the royalty of 20 cents per ton for all ore which it so shipped or removed from said mine. The Shenango Furnace Co. employed two methods in mining ore on said premises, namely, the open-pit method and the shaft or underground method.

7. Commencing in July, 1910, and continuing during the years 1911 and 1912 and until about February 28, 1913, the said lessee mined from said Shenango mine and hauled away from the leased land to other property not owned or in any way controlled by lessor and without weighing or causing the same to be weighed, large quantities of iron ore, to wit, about 1,480,643 tons, without making payment of royalties due to said lessor therefor. There were also mined and removed from the Shenango mine by lessee after March 1, 1913, and stockpiled, as hereinafter stated, without being weighed or paid for, 1,269,310 tons. The iron ore removed as stated above was stockpiled on what is known as the Pillsbury and Niles land, according to the following tabulated statement:

| Stockpile No. | Location. | Prior to Mar. 1, 1913. | After Mar. 1, 1913. | Totals, 1910–1918. |
|---|---|---|---|---|
| | | *Tons.* | *Tons.* | *Tons.* |
| 1 | Niles 40s | 289,500 | | 289,500 |
| 1 | Pillsbury 40s | 671,616 | 481,993 | 1,153,609 |
| 1 | McCahill land | | 170,753 | 170,753 |
| 2 | Pillsbury 40s | 468,150 | 495,034 | 963,184 |
| 3 | do | 51,371 | 121,530 | 172,901 |
| Total stockpiled | | 1,480,637 | 1,269,310 | 2,749,947 |

All of the ore placed in stockpile by the Shenango Furnace Co., the lessee herein referred to, was taken by the open-pit steam shovel method from an open-pit mine on taxpayer's premises.

8. Under the terms of the lease, lessee was to pay royalty at the rate of 20 cents per ton for all iron ore mined and removed from the premises, and such royalty became due and payable on the 10th day of the month after the close of each quarter year following such taking and removal.

9. Mary E. McCahill frequently demanded payment for said iron ore so mined, removed, and stockpiled, but said lessee refused to make payment therefor until a notice to cancel the lease had been served on the lessee and an action had been instituted in the district courts by the lessee to enjoin the lessor from taking any steps to cancel the lease or take possession of the leased premises.

10. Negotiations for settlement for royalties on stockpiled ore were thereafter carried on between the lessor and the lessee, and on July 16, 1914, they entered into a contract in writing fully compromising and settling the injunction proceedings and all differences and controversies between the lessor and lessee in regard to ore taken from open-pit mine and stockpiled.

11. In the agreement of compromise and settlement the lessee conveyed to Mary E. McCahill the title in fee to the land (called the Pillsbury forties) upon which certain quantities of such stockpiled

ore had been deposited by it, the said land and the ore thereon to be regarded thereafter as though they were a part of leased premises, with a reservation that at the expiration of said mining lease the lessee shall have the right at its option to designate, point out, and have staked off in some compact space so much of such ore as the lessee should have paid for, and at the request of the lessee said lessor should execute a deed reconveying to the lessee the land covered by such ore. It was provided in said agreement of compromise and settlement that from and after March 1, 1914, the lessee, in addition to paying royalty, should pay to the fee owner, from time to time, so long as the said mining lease should continue in force and as royalties are payable thereunder, a sum equal in amount to 10 cents per ton on all ore mined and shipped directly from said leasehold premises until a sufficient amount has been paid to the fee owner in such extra payments to cover the royalty at the rate of 20 cents per ton on the lean ore already stockpiled, until 1,500,000 tons have been thus or otherwise paid for. After payment has been made on account of the said 1,500,000 tons of lean ore, the lessee shall from time to time, so long as the said lease continued in force, and in like manner, continue to pay to the fee owner, an additional sum equal in amount to 10 cents per ton on all the ore mined and shipped directly from the leasehold premises, until a sufficient amount had been paid to the fee owner in such extra payments, or otherwise, to cover the royalty at the rate of 20 cents per ton on all the ore stockpiled on said leasehold premises after March 1, 1914, and running in its natural state 36 per cent and higher in metallic iron.

12. All payments contemplated under said compromise agreement were made in the years 1914 to 1920, inclusive. The lessee paid lessor the royalties on 1,500,000 tons of said ore in stockpile when the said agreement was made, which was July 16, 1914, plus the royalties on 528,297 tons of ore stockpiled after said date, aggregating $405,659.56 for 2,028,297 tons of stockpiled ore. Said payments were made as follows:

In 1914, lessee paid to the lessor royalties aggregating $50,966.20, which constituted full payment for 254,831 tons of ore stockpiled prior to March 1, 1913. During the year 1915, the lessee paid to the lessor royalties aggregating $93,962.25, which was in full payment for 469,815 tons of ore stockpiled prior to March 1, 1913. During the year 1916, lessee paid to lessor royalties aggregating $98,477.28, which constituted full payment for 492,386 tons of ore stockpiled prior to March 1, 1913. During the year 1917, lessee paid to the lessor royalties aggregating $52,722.20, which constituted full payment for 263,611 tons of ore stockpiled prior to March 1, 1913. During the year 1917, lessee paid to lessor additional royalties

aggregating $15,003.60, which constituted full payment for 75,018 tons of ore stockpiled after March 1, 1913. During the year 1918 lessee paid to the lessor royalties aggregating $52,530.06, which constituted full payment for 262,650 tons of ore stockpiled after March 1, 1913. During the year 1919, lessee paid to the lessor royalties aggregating $24,026.07, which constituted full payment for 120,130 tons of ore stockpiled after March 1, 1913. During the year 1920, lessee paid to the lessor royalties aggregating $17,971.20 for 89,856 tons of ore stockpiled after March 1, 1913.

13. The decedent in her amended return for the year 1916 and her returns of income or the years 1917, 1918, and 1919, deducted depletion at the rate of $0.167829 per ton as the estimated fair market value per ton on March 1, 1913. In arriving at this estimate she adopted the estimate of the Minnesota Tax Commission, which was 7,138,831 tons. Upon that tonnage decedent expected to receive, according to the terms of the lease, 20 cents per ton, or an aggregate of $1,427,766.20. During a period of nine years (1909 to 1917) of mining by the open-pit method the Shenango Furnace Co. had mined and removed an average of 802,121 tons per year, at which rate it was estimated the March 1, 1913, tonnage would be removed by the end of the year 1921. Under this estimate the executors claim the fair market value of the mine on March 1, 1913, was determined to be $1,198,104.01, which estimated tonnage produced a fair market value on March 1, 1913, of $0.167829 per ton.

14. The Commissioner computed the fair value on March 1, 1913, at $0.148515 per ton for the open-pit iron ore and $0.101206 per ton for such ore as was to be mined by the underground method. For the years 1916, 1917, and 1918, the Commissioner allowed and deducted depletion at said rates on tonnages of ore newly mined. For the year 1919 the Commissioner allowed and deducted depletion on such tonnages of ore newly mined and shipped at a flat rate of $0.131468 per ton, without regard to whether it was open-pit iron ore or underground iron ore.

15. The cost or fair market value on March 1, 1913, of the decedent's claims against the Shenango Furnace Co. was equal to the amount agreed upon in 1914 in the settlement of such claims.

### DECISION.

The deficiency as determined by the Commissioner is allowed in part and disallowed in part. The tax liability of the executors should be computed in accordance with the following opinion. Final determination will be settled on consent or on 10 days' notice, in accordance with Rule 50.

OPINION.

GRAUPNER: The questions involved in this appeal are: (1) Whether the executors are entitled to a deduction for 1916 for the exhaustion, wear and tear of the ʻfarm buildings arising out of their use and employment in the farming and stock-raising business; (2) whether the royalties received for iron ore mined, removed, and stockpiled prior to March 1, 1913, are taxable income; and (3) whether the executors are entitled to a greater allowance for depletion of the Mary E. McCahill mineral interests on the ore mined, removed, stockpiled, and sold after March 1, 1913, than that allowed by the Commissioner? We will take up the propositions in the order named above.

From the evidence submitted it appears that decedent was the owner throughout the year 1916 of a 1,360-acre farm in Wabasha County, Minn., upon which there were a number of buildings which were used for the purpose of carrying on farming operations and stock raising as a business, and that no depreciation on said buildings, or any of them, had been allowed in the Commissioner's determination of net income for the year 1916. The Commissioner during the trial acknowledged that a mistake was made in the valuation of the farm buildings during the year 1916, and we are of the opinion that the executors are entitled to a reasonable deduction for 1916 for the exhaustion, wear and tear of the farm buildings, and they are allowed to deduct from gross income the sum of $1,362.50, the amount claimed by them as and for depreciation on the farm buildings during said year.

The second proposition involved in this appeal is whether or not the amount received for ore mined, transported, and removed from the premises of the lessor prior to March 1, 1913, but which was not paid for until after March 1, 1913, is taxable income. The Shenango Furnace Co., a corporation, operated a mine on the premises of lessor for several years prior to 1910 and mined, shipped, and paid a royalty of 20 cents per ton to lessor, according to the terms of the lease, for all ore which was so shipped. Beginning in July, 1910, and continuing during the years 1911 and 1912 and until about February 28, 1913, the lessee, through the open-pit method of mining, mined and removed a certain amount of ore and stockpiled it on premises in which the lessor had no interest, and the lessee did not pay for this ore so removed and stockpiled. On December 31, 1913, a demand was made by the lessor upon the lessee for payment of the amount of royalty provided for in the lease and, in case of failure to pay such royalty, the lessor demanded possession of the mine, whereupon an action was commenced by the lessee to enjoin the lessor from taking possession of the mine or in any way inter-

fering with the operations of the mine. While the action was pending, negotiations of settlement were carried on and, on July 16, 1914, a settlement was made whereby the lessee agreed to pay the lessor for all ore mined and stockpiled prior to March 1, 1913, as well as for all ore mined and stockpiled subsequent to March 1, 1913, according to the findings hereinbefore set forth. In the determination by the Commissioner of gross income for the years 1916 and 1917 were included the amounts paid by the lessee to the lessor for ore mined and stockpiled prior to March 1, 1913. Under the terms of the lease set forth in the findings, the relation of the decedent to the lessee was that of landlord and tenant. Such leases have been before the courts frequently and it has uniformly been held that they create only the relation of landlord and tenant and that the royalties are rents and are not the purchase price of ore sold. *State v. Evans*, 99 Minn. 220; *Lynch v. Alworth-Stephens Co.*, 267 U. S. 364; O. D. 591 (Cum. Bul. No. 3, p. 113). The amount due decedent from the lessee prior to March 1, 1913, was an obligation which not even a forfeiture of the lease would have extinguished. *Appeal of Producers Fuel Co.* 1 B. T. A. 202. Only the increase, if any, over the cost or March 1, 1913, value could be taxed under the statute. *Lynch v. Turrish*, 247 U. S. 221. Under the terms of the settlement between the lessor and the lessee, no interest was paid on the amount due prior to March 1, 1913. From the evidence submitted we are of the opinion that the royalties received for ore mined, removed, and stockpiled prior to March 1, 1913, were not taxable income but were choses in action and due decedent prior to March 1, 1913. The determination of the Commissioner in regard to the amount paid for ore mined prior to March 1, 1913, is disallowed.

The third proposition involved in this appeal is whether or not the executors are entitled to a greater amount of allowance for the depletion of mineral interests on the ore mined, removed, stockpiled, and sold after March 1, 1913, than that allowed by the Commissioner. Some evidence was submitted at the trial as to the estimated fair market value per ton on March 1, 1913, but such evidence was very indefinite, both as to the value per ton on March 1, 1913, and as to the amount of tonnage, and, in the absence of sufficient proof to the contrary, the executors are not entitled to a greater rate of depletion for ore mined after March 1, 1913, whether such ore was mined by the open-pit method or underground method, than that allowed by the Commissioner, and the determination of the Commissioner as to the value of ore mined after March 1, 1913, is approved.

ARUNDELL not participating.